No. 41,816

W. J. GILBERT, *Appellee*, v. W. R. MATHEWS, County Attorney of Cowley County, Kansas, and JOHN ANDERSON, JR., Attorney General of the State of Kansas, *Appellants*.

(352 P. 2d 58)

Opinion filed May 14, 1960.

*Robert C. Londerholm*, Assistant Attorney General, argued the cause, and *John Anderson, Jr.*, Attorney General, and *W. R. Mathews*, County Attorney, were with him on the brief for the appellants.

*George Templar*, of Arkansas City, argued the cause, and *Earle N. Wright* and *Ted M. Templar*, both of Arkansas City, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action under the declaratory judgment act of Kansas (G. S. 1949, 60-3127, *et seq.*) to determine the con-

stitutional validity of the "New Goods Public Auction Law" enacted by the legislature in 1955, being Chapter 172 of the Laws of 1955. (G. S. 1959 Supp., 58-1001, *et seq.*) It has not since been amended or repealed.

Appeal has been duly perfected from the judgment of the district court of Cowley County, Kansas, declaring Sections 2 to 11, inclusive, of the act unconstitutional and void. These sections comprise the substance of the act.

The parties concede there is an actual controversy between them and no jurisdictional or procedural questions are raised. Under these circumstances the decision of *Little v. Smith*, 124 Kan. 237, 257 Pac. 959, is controlling. A recent case sustaining jurisdiction is *State Association of Chiropractors v. Anderson*, 186 Kan. 130, 348 P. 2d 1042.

Issues were joined by the pleadings following which the parties presented and filed a stipulation of facts with the trial court, agreeing to submit the case upon the pleadings and the stipulation so prepared and filed. The stipulation will serve as a basis for presenting the facts and the contentions of the parties. The material portion of the stipulation hereafter set forth includes a summarization of various sections of the act which are identified by inserting the section number in brackets following the quoted summarization. In addition to the facts heretofore stated the stipulation recites there is an actual antagonistic assertion by the plaintiff, W. J. Gilbert, (appellee), of his rights and a denial of such rights by the defendants (appellants), which controversy the parties wish determined. It then reads in part:

"3. That plaintiff is a resident and citizen of Leawood, in Johnson County, Kansas, and defendant, Mathews, is the duly elected, qualified and acting County Attorney of Cowley County, Kansas, and defendant, Anderson, is the duly elected, qualified and acting Attorney General of the State of Kansas, and are charged with the duty and responsibility of prosecuting the violation of all laws of the State of Kansas.

"4. Plaintiff is an auctioneer and has been for many years conducting retail sales of personal property by public auction within the State of Kansas. That he sells new merchandise not previously sold at retail at public auction or by exhibiting and offering such new goods for sale at a fixed and labeled price. Plaintiff is an individual proprietor of such business.

"5. Plaintiff does not sell new goods at public auction from a permanent place of business within the State of Kansas, but sells new goods at public auction in various communities in the State of Kansas following the advertising of the time and place of such sales.

"6. On October 3, 1958, plaintiff advertised and conducted a sale of new goods, wares and merchandise at Hackney, within Cowley County, Kansas, and on October 3, 1958, Defendant Mathews, as County Attorney of Cowley County, Kansas, filed a complaint in the City Court of Winfield, Kansas, charging that plaintiff had conducted a public auction sale of new merchandise without obtaining a license to do so from the County Clerk. Plaintiff was arrested pursuant to said complaint, posted bond for his appearance, and said criminal action now pends against him.

"7. That plaintiff did not apply for, or obtain, a license to conduct a public auction of new goods at Hackney, Kansas, on October 3, 1958, from the County Clerk of Cowley County under provisions of G. S. 1957 Supp., Sec. 58-1001 *et seq.*, being Chapter 172, Laws of 1955.

"8. Chapter 172, Laws of 1955 provides that in making an application for a license to the County Clerk of the County in which the auction is to be had, the applicant shall:

"(*a*) Make the application at least ten days prior to the date on which the sale is to be held. [Section 3.]

"(*b*) State the name, residence and post office address of the applicant. [Section 3.]

"(*c*) State the name, residence and post office address of the person who will conduct the sale. [Section 3.]

"(*d*) Furnish a detailed inventory and description of all such merchandise to be offered for sale at public auction which inventory shall set forth the source, make and model [also] the serial number, if any, and the cost of the merchandise to be offered for sale, and state the number of days the auction will be held. [Section 3.]

"(*e*) Submit a receipt showing that personal property taxes on the goods to be offered for sale or sold have been paid. [Section 4.]

"(*f*) File a copy of a notice to the Director of Revenue which must set forth the time and place where the auction is to be held, the value of the goods to be offered for sale or sold and such other information as the Director of Revenue may require, which notice must be delivered to the Director of Revenue by registered mail ten days before the application for license is filed with the County Clerk. [Section 4.]

"(*g*) File and deposit a bond with the County Clerk as a part of and at the time the application is filed with corporate sureties to be approved by the Clerk, in the [penal] sum of twice the value of the merchandise to be offered for sale, in which the state must be named as obligee, for the use and benefit of any purchaser of such merchandise at the auction who might have a cause of action of any nature resulting from a sale at the auction against the applicant [or against the auctioneer]. The bond must be conditioned for the payment of any tax due the state or any subdivision of it; the payment of any fines against the applicant [or against the auctioneer] for violation of the auction law; the satisfaction of any cause of action commenced within one year from the date of the sale and arising therefrom [Section 5.]; . . . The applicant and sureties shall in the bond appoint the County Clerk their agent for the service of process. The County Clerk shall within five days after the service of any process on him send a copy

thereof by ordinary mail to the party for whom he has been served to his last-known address. Failure to so mail said copy shall not, however, affect the court's jurisdiction. [Section 5.]

"(*h*) File the receipt of the County Treasurer for payment to him by the applicant of a license of $50 per day for the entire time he estimates he will conduct an auction [Section 6]. The license is not transferable and is valid only in the county where issued except that it is not valid in any city which has an ordinance licensing such auctions unless a license has also been obtained from the city which license is not in lieu of a county license. A license may be used for only one place in the county. [Section 7.]

"9. Within ten days after the last day of a public auction, the applicant must file in duplicate with the County Clerk, an inventory verified by the person making the application of all goods sold at such auction and the price received therefor, a copy of which shall immediately be sent to the Director of Revenue by the Clerk. [Section 8.]

"10. The law authorizes all incorporated cities to tax, license and regulate all persons who engage in or desire to engage in public auctions, and to charge a fee therefor not to exceed $50 per day, which shall not be in lieu of the county license required under the Act, but in addition to it. [Section 11.]

"11. The law inflicts for each violation of the Act a fine of not less than $200 nor more than $1,000 to which may be added imprisonment in the county jail of not less than 30 days nor more than 180 days. [Section 9.]

"12. The license is not required:

"(*a*) Of public auction of livestock, farm machinery or farm produce or other items commonly sold at farm sales.

"(*b*) By individuals for auction sales of new merchandise which was assessed personal property tax or is replacement stock of merchandise inventory which was assessed personal property tax in the county in which the sale is to be had.

"(*c*) Of court officers selling goods according to law.

"(*d*) Of commercial travelers or agents selling in usual course of business to dealers.

"(*e*) Bonafide assignees or receivers appointed to sell goods for benefit of creditors. [Section 10.]

"13. Plaintiff holds a certificate or registration issued by the Director of Revenue to sell tangible personal property as a transient seller in the State of Kansas, and has complied with the requirements made of him by the Director of Revenue under provisions and regulations adopted under the 'Kansas Retailers Tax Act,' being G. S. 1949, 79-3601, *et seq.*

"14. No corporate surety company doing business in Kansas will sign the form of corporate surety bond required by Section 5 of the Act unless secured by the applicant to the full extent of liability thereon.

"15. It is by the parties to this action further stipulated that the defendants contend the 'New Goods Public Auction Law' enacted by the Legislature of the State of Kansas is a valid constitutional exercise of police power by the state to prevent abuses and frauds under the general police power and that it promotes the public health, safety and welfare of the people and citizens of the state.

"16. The parties further stipulate that plaintiffs contend that under guise of public interest, Sections 2, 3, 4, 5, 6, 7, 8, 9 and 10 of the Act impose conditions upon him to conduct a lawful business which are on their face unreasonable, discriminatory or confiscatory, and that the regulations imposed by the Act do not rest upon any interest of public policy, or do they promote public morals, health, safety or welfare, but are imposed for the purpose of limiting or eliminating competition for the benefit of persons engaged in other plans of selling goods, and tend to destroy lawful competition or create trade restraints tending to create a monopoly; that Section 5 of the Act provides for the denial of due process of law, in that the service of process is not required communicated to the person or corporation against whom action is brought; that the Act deprives plaintiff of his property and property rights without due process of law, and denies equal protection of the law, all in violation of the constitution and laws of the State of Kansas and the constitution of the United States."

Section 2 of the act provides:

"It shall be unlawful for any person, firm or corporation to sell, dispose of, or offer for sale at public auction in this state any new goods, wares or merchandise, unless such person, firm or corporation, and the owners of such new goods, wares or merchandise to be offered for sale or sold if such are not owned by the vendors, shall have first secured a license as herein provided and shall have complied with the other requirements of this act."

With the foregoing addition the stipulation substantially paraphrases the provisions of the act which are challenged.

While there are no Kansas cases specifically in point, it is universally recognized that the business of an auctioneer and of selling merchandise at auction is a legitimate business which cannot be prohibited directly or indirectly. However, the right to sell at auction is not absolute but may be withheld unless there is compliance with reasonable regulations. The business is affected with a public interest and is subject to reasonable legislative restriction and regulation to prevent abuses and frauds. Requirements for the licensing of auctioneers and auctions as well as other regulations which are reasonable and not wholly arbitrary have long been upheld. The right to regulate and license the business does not, however, include the right to prohibit it directly or, in effect, to adopt unreasonable and unfair regulations, or such regulations as would be oppressive or highly injurious to the business. (7 C. J. S., Auctions and Auctioneers, § 2, p. 1241; 5 Am. Jur., Auctions, §§ 3, 4 and 7, pp. 447, 448 and 450; and Annotations, 31 A. L. R. 299, 39 A. L. R. 773, 111 A. L. R. 473.)

The source of the authority to regulate auctions is the police power of the state. This court has repeatedly held that the police

power of the state extends not only to the protection of the public health, safety and morals, but also to the preservation and promotion of the public welfare. (*State v. Consumers Warehouse Market*, 183 Kan. 502, 329 P. 2d 638, and cases cited therein.)

It is settled that a state must exercise its police power subject to constitutional inhibitions. In *Panhandle Co. v. Highway Comm'n.*, 294 U. S. 613, 79 L. Ed. 1090, 55 S. Ct. 563, it was said:

"The police power of a State, while not susceptible of definition with circumstantial precision, must be exercised within a limited ambit and is subordinate to constitutional limitations. It springs from the obligation of the State to protect its citizens and provide for the safety and good order of society. Under it there is no unrestricted authority to accomplish whatever the public may presently desire. It is the governmental power of self protection, and permits reasonable regulation of rights and property in particulars essential to the preservation of the community from injury . . ." (p. 622.)

By constitutional provisions all men are possessed of equal and inalienable natural rights, among which are life, liberty and the pursuit of happiness, and no distinction shall ever be made between citizens of the State of Kansas and the citizens of other states and territories of the United States in respect to the purchase, enjoyment or descent of property. (Kansas Constitution, Bill of Rights, §§ 1 and 17.) The Federal Constitution safeguards the citizens from state legislation which abridges his privileges and immunities or denies him the equal protection of the laws or deprives him of liberty or property without due process of law. (Constitution of the United States, Amend. 14, § 1.)

While the police power is wide in its scope and gives the legislature broad power to enact laws to promote the health, morals, security and welfare of the people, and further, that a large discretion is vested in it to determine for itself what is deleterious to health, morals or is inimical to public welfare, it cannot under the guise of the police power enact unequal, unreasonable and oppressive legislation or that which is in violation of the fundamental law. (*Little v. Smith*, 124 Kan. 237, 257 Pac. 959.)

When once a subject is found to be within the scope of the state's police power the only limitations upon the exercise of the power are that regulations must have reference in fact to the welfare of society and must be fairly designed to protect the public against the evils which might otherwise occur. Within these limits the legislature is the sole judge of the nature and extent of the measures

necessary to accomplish its purpose. (*Schaake v. Dolley*, 85 Kan. 598, 118 Pac. 80; and *State v. Consumers Warehouse Market*, supra.)

The question presently before the court is not the general power of the legislature, but *whether this particular enactment was a lawful and constitutional exercise of the power to regulate.* The reasonableness of restrictions imposed by the legislature by the exercise of the police power is a judicial matter, and all presumptions are in favor of the constitutionality of the act. Within the zone of doubt and fair debate legislation is conclusive upon the court and must be upheld. The appellee, plaintiff below, has the burden to negative every conceivable basis which may support this act.

The controlling principle is that if legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for the government to effect, the legislature transcends the limits of its power in interfering with the rights of persons affected by the legislation, but if there is reasonable relation to an object within governmental authority, the exercise of the legislative discretion is not subject to judicial review. Our problem is whether or not the Kansas "New Goods Public Auction Law" places arbitrary and unreasonable limitations, regulations and impositions on the conduct of a lawful business; whether or not it is class legislation; or whether or not it prohibits rather than regulates.

The "New Goods Public Auction Law" *purports* to be an attempt to exercise the police power of the state. It is clear under Section 2 the act limits its application to the selling of *new goods, wares or merchandise only,* which is defined in Section 1 of the act to mean those *not previously sold at retail.*

Similar acts have been before the Supreme Courts of Nebraska and Iowa. The Nebraska act (designated the "Nebraska Public Auction Law," Laws 1955, c. 266, p. 832; §§ 69-801 to 69-817, R. S. Supp. 1955) was declared unconstitutional in *Blauvelt v. Beck,* 162 Neb. 576, 76 N. W. 2d 738, because it made an arbitrary and unreasonable classification by limiting the right to conduct auction sales of new merchandise to less than all who were similarly situated without distinctive circumstances which reasonably justified such limitation. The Iowa act (chapter 546A, Code, 1954; chapter 239, Acts, 55th General Assembly, 1953, requiring a license to sell new merchandise at public auction) was held constitutional in *Steinberg-Baum & Co. v. Countryman,* 247 Iowa 923, 77 N. W. 2d 15.

A careful study of the Nebraska and Iowa statutes indicates that the Nebraska act is almost identical with the Kansas act, except it does not have a savings clause and has an additional provision which conditions the required bond (in addition to the provisions of Section 5 in the Kansas act) on "the payment by the applicant to purchasers at such public auctions of any loss or damage occasioned to any purchaser by reason of the breach of any express or implied warranty of the manufacturer, owner, or seller, including costs of servicing and repairs incurred by purchasers within the warranty, unless the owner or seller of such goods, wares, and merchandise shall clearly set forth in all public notices of such auctions that the goods to be sold are not warranted or guaranteed in any manner and that all costs of servicing and repairs will have to be paid by the purchaser." (Nebraska R. S. Supp. 1955, 69-807.) The Iowa act in many respects is similar to the Kansas act but varies in approximately ten particulars, some of the provisions in vital respects being less drastic than the corresponding provisions in the Kansas act. The Iowa court referred to the Nebraska decision as follows:

"Careful consideration has also been given Blauvelt v. Beck, 162 Neb. 576, 76 N. W. 2d 738. The statute there held invalid is, in some vital respects, more exacting than our statute. We are not to be understood, however, as approving all that is said in the Blauvelt opinion." (p. 935.)

It is significant to note that in the Iowa case the plaintiff, who succeeded in the trial court in having the act declared unconstitutional, did not make an appearance or file a brief in the Iowa Supreme Court.

We think it clear the "New Goods Public Auction Law" is purposely designed to completely eliminate the sale of new merchandise at public auctions by itinerant vendors. The act contains some provisions that might not be construed as violative of the fundamental rights of persons doing business in the state, but it has other provisions which transcend constitutional prohibitions that permeate the entire act.

It must be conceded the legislature may subject the business of an auctioneer, and of selling merchandise at auction, to reasonable regulations and restrictions to prevent abuses and frauds. Reasonably construed, the act cannot be said to make an arbitrary and unreasonable classification by Section 2 of the act, limiting its operation to the sale of *new goods,* wares and merchandise. Section 10 of the act, in effect, classifies and limits the operation of the act to itinerant auctioneers and exempts permanently established mer-

chants who might conduct auction sales in the county where their permanent business is located. It may be said those who dispense goods as itinerant merchants are usually here today and gone tomorrow. This classification we think well within the discretionary power of the legislature to make.

It cannot be said the act discriminates between residents and nonresidents of the state and thereby places a greater burden upon nonresidents than upon residents, because the act applies equally to residents. The appellee herein is a resident of the State of Kansas. Constitutional provisions do not require that all laws shall apply alike to all citizens of the state. It is sufficient if a statute applies equally to members of a class, provided the classification is not purely arbitrary but rests upon some reasonable basis.

The legislature may well have found there are greater opportunities for deception and fraud in such sales than in those from established places of business. Also that those who conduct such auctions require more policing and are a greater burden to the community since they assume no responsibility for its welfare.

The bond required by Section 5 of the act in the amount of twice the value of the goods offered admittedly cannot be procured unless the principal secure the *sureties* to the full extent of the liability thereon. In other words, this requires a cash bond for each sale, or the equivalent. This requirement, therefore, amounts not to a condition precedent to obtaining a license, but in effect amounts to a practical prohibition for itinerant merchants to the conduct of a public auction of new goods as defined by the act itself. *The bond is not conditioned for the payment of damages sustained on account of dish'onest or fraudulent conduct,* but must be given to the state for the use and benefit of any purchaser "who might have a cause of action of any nature arising from or out of a sale or sales at such auction." This would include costs of servicing and repair, breach of implied warranty of the manufacturer and many other liabilities which resourceful and ingenuous buyers might conceive. It is undoubtedly the reason which surety companies give in refusing to execute such a bond.

Clearly this is not giving to all citizens the equal protection of the law by requiring one retailer to personally guarantee the performance of the manufacturer and not requiring other retailers to do so. It is, therefore, unnecessary to discuss whether a legislative provision requiring auctioneers to furnish a bond against misrepresentation would be a reasonable regulation, since that question is

not before the court. The bond required here is one which can be called upon to answer for the default of someone else over whom there is no control, and hence placing a burden on a business that does not represent in any way an obligation assumed by any other retailer or seller.

Abuses may, and probably do, grow up in connection with the auction business and are adequate reason for regulation, but this is not enough to justify destruction of one's right to follow a distinctly useful calling in an upright way. (*Adams v. Tanner,* 244 U. S. 590, 61 L. Ed. 1336, 37 S. Ct. 662.)

In the case of *Fairmont Co. v. Minnesota,* 274 U. S. 1, 71 L. Ed. 893, 47 S. Ct. 506, it is said:

"'. . . It is not permissible to enact a law which, in effect, spreads an all-inclusive net for the feet of everybody upon the chance that, while the innocent will surely be entangled in its meshes, some wrongdoers also may be caught.' . . ." (p. 10.)

It must be observed we are not here concerned with a public auction law to regulate and control the sale of jewelry. Concededly, statutes applying to the sale of jewelry, which are strict in their terms, have been sustained because such sales provide a unique opportunity for fraudulent imposition upon the public, but that is not the situation here. (See, Annotation, 53 A. L. R. 2d 1433, 1435.)

In the case of *Carolene Products Co. v. Banning,* 131 Neb. 429, 268 N. W. 313, it was said:

". . . We cannot say that a few instances of deception on the part of retailers are sufficient to give authority to the legislature under the police power to prohibit the sale of a product. To so hold would give the legislature power to prohibit the sale of any article on the market, as all are subject to the possibility of being misrepresented. If retailers of a wholesome and nutritious food product practice deception in its sale, the remedy is by regulation and not by a destruction of the business . . ." (p. 437.)

The arbitrary and unreasonable character of the act is indicated by various requirements made of an applicant under the act.

The law provides that a notice be sent to the Director of Revenue twenty days before the date of the proposed sale (Section 4), and then ten days before the sale, the application to the county clerk must be accompanied by an inventory showing the source, make and model, also the serial number, if any, *and the cost of the merchandise to be offered for sale* (Section 3[d]). Thereafter, and within ten days after the last day of a public auction, the act

(Section 8) requires a report to both the county clerk and the Director of Revenue showing the property actually sold at such auction and the prices received therefor. Is all this information designed to assist in the collection of taxes?

The appellants argue the act contains reasonable provisions designed to prohibit or lessen unequal and unfair competition by helping to prevent tax evasion on the part of itinerant auctioneers. It may be conceded the prohibition of unequal and unfair competition is within the scope of the police power of the state. (*State v. Consumers Warehouse Market*, supra.)

Actually the applicant for a license under the provisions of the statute (Section 4) *must show that he has already paid the personal property taxes* on his new merchandise to be offered for sale or to be sold. It is stipulated in this action that the appellee holds a certificate of registration issued by the Director of Revenue to sell tangible personal property as a transient seller in the State of Kansas, and has complied with all the requirements made of him by the Director of Revenue under the "Kansas Retailers' Sales Tax Act." (G. S. 1949, 79-3601, *et seq.*)

Not only must the applicant present a receipt to the county clerk showing all personal property taxes paid on the merchandise to be offered for sale at the time of applying for his license (Section 4), but he must post a new bond, signed by corporate sureties, for each sale he holds (Section 7), and all this, even though he has already complied with the requirements of the Department of Revenue under the sales tax law.

The act is ambiguous as to where the applicant must pay the tangible personal property taxes, the receipt of which must be filed with the county clerk where the application is made. Though somewhat speculative, presumably the taxes must be paid in the county where the new merchandise is to be sold, since it is located there and the act is designed to apply to itinerant merchants. Section 10 of the act exempts from the provisions of the act "auction sales by individuals of new merchandise, which was assessed personal property tax or is replacement stock of merchandise inventory which was assessed personal property tax in the county in which the sale is to be had." While this is strictly an exemption section of the act and does not purport to impose any tax or tax assessment, it must be read with other provisions of the act, particularly Section 4 which requires the filing of a tax receipt by the applicant. Conceivably

under the quoted exemption provision if an itinerant merchant paid the personal property taxes on the new merchandise to be sold in the county where the sale is to be conducted, the applicant would be exempt from the provisions of the act, since the tax cannot be determined without an assessment. But if the appellants' brief is correctly interpreted, the act is not so construed in its application. Under these circumstances the practical interpretation of Section 4 is that it requires a re-assessment of the appellee's property for taxation as often as he moves from one location to another. If, on the other hand, it is argued the act does not purport to impose any tax or tax assessment, we are on the other horn of the dilemma. How can the legislature require the filing of a tax receipt where no tax or tax assessment has been imposed? No receipt for personal property taxes discloses or describes the property that was assessed (except automobiles) as the basis for the taxes paid, and the amount of taxes due on the property assessed on March 1st (now January 1st) cannot be determined until the tax authorities determine the assessment or levy that is to be made for the current year.

It seems perfectly clear from this poorly and awkwardly drawn act that it was designed to be so oppressive and unreasonable that no applicant could comply with its terms. The evidence is overwhelming that the so-called "New Goods Public Auction Law" was enacted, not to reasonably regulate, but to altogether eliminate the sale of new merchandise by itinerant merchants at auction.

One might ask what purpose a detailed inventory describing the property to be sold and giving its *cost* ten days in advance of sale has in connection with the collection of taxes. It is designed for only one purpose and that is to force disclosure of the cost in advance of the auction to the public and competitors in the business of merchandising. Normally the cost of goods is considered a trade secret and it cannot be argued that retail sales taxes have any relationship to the cost, nor is the cost material in making an assessment for personal property taxes. This feature viewed together with other requirements of the act clearly indicates the arbitrary and unreasonable character of the act.

The second paragraph of Section 5 of the act provides that the applicant and surety and the auctioneer shall appoint the county clerk as agent for the acceptance of service of process, which appointment shall be irrevocable. It then provides in the event of service of process, "the agent on whom such service is made *shall*,

within five (5) days after the service, mail by ordinary mail a true copy of the process served upon him to each party for whom he has been served, addressed to the last known address of the party. *Failure to so mail said copy will not, however, affect the court's jurisdiction.*" (Emphasis added.)

The net result is that the law attempts to make it immaterial that the person sued has no actual notice or means of knowledge that he is subjected to the hazards of the suit and final judgment, and, of course, no opportunity to be heard in defense. Such provision was not intended to inspire the agent to promptness, diligence and prudence in mailing the copy in such manner that it would probably reach the person for whom the process was issued.

The county clerk designated as the agent for service of process has available in his office as a part of the application for a license the name, residence and address of the defendant. Legislation in this state concerning notice to a person by use of post service has generally required transmission of notice by registered mail.

Where a statute specifies a method of notifying a defendant that he has been sued in court, the method of transmitting the notice to defendant must be one that is reasonably calculated to give the defendant actual notice of the pending action and an opportunity to be heard in defense. (72 C. J. S., Process, § 51, p. 1065.)

Service on a defendant of the character selected and attempted by the statute involved in this case should contain the requirement that makes it reasonably probable that the defendant will receive actual notice. Anything less than this is not due process. (*Wuchter v. Pizzutti,* 276 U. S. 13, 72 L. Ed. 446, 48 S. Ct. 259, 57 A. L. R. 1230.) A fundamental requisite of due process of law is an opportunity to be heard. The statute in this respect is arbitrary and unreasonable and a citizen may not be subjected to such an implicit hazard as one of the conditions precedent to being permitted to engage in a lawful business.

The "New Goods Public Auction Law" requires that an applicant for a license pay a license fee or tax of $50 per day for the entire estimated duration of the auction to the county treasurer of the county where the application is made, and that he file a receipt therefor with his application (Section 6). The license authorizing the conduct of an auction, when issued, is valid in only one place in the county and is good for only one person unless such persons are co-partners. The license is not transferable, is valid only in

the county where issued, and is not valid in any city which has enacted an ordinance "licensing public auction sales unless a license is also obtained from such city." (Section 7.) The act provides a penalty against every person, firm or corporation, either principal or agent, who shall in any manner engage in, or conduct a public auction, without first obtaining the license required (Section 9). This section requires the auctioneer as an agent or the person holding the sale to have a license, as well as the seller, or any person who assists as an agent in holding the sale, unless they are co-partners. (See, Sections 7 and 2.)

Section 11 of the act expressly gives all incorporated cities of this state power and authority to tax, license and regulate persons engaging in or desiring to engage in public auctions, and may require a license and charge a fee therefor not in excess of $50 per day but shall be in addition to the fee for a county license of $50 per day. "Such city license shall not be in lieu of a county license under this act."

The practical effect of this is that, if the statute is valid, an auction may only be conducted by one who has secured a county license for a fee or tax of $50 per day and a license from the city at an additional cost of $50 per day, or a total outlay of $100 per day for the duration of the auction. He may be subjected to duplicate regulations as provided in the statute. It is permissible under the language of the statute for a city to adopt an ordinance containing substantially all of the terms of the statute.

In appraising the validity and effect of the statute it is proper to examine and determine what may be required under it pursuant to its provisions. The inquiry is not confined to what has been done under the act in any particular instance, but what may be done under and by virtue of its authority. The constitutional validity of a law is tested by what may by its authority be done. (11 Am. Jur., Constitutional Law, § 102, p. 737; *Montana Company v. St. Louis Mining &c. Co.*, 152 U. S. 160, 38 L. Ed. 398, 14 S. Ct. 506; *Burtch v. Zeuch*, 200 Iowa 49, 202 N. W. 542, 39 A. L. R. 1349; *Replogle v. Little Rock*, 166 Ark. 617, 267 S. W. 353, 36 A. L. R. 1333; and *Abbott v. McNutt*, 218 Cal. 225, 22 P. 2d 510, 89 A. L. R. 1109.)

A statute that makes it possible for dual regulations to be imposed upon persons affected by it, under the circumstances here presented, is arbitrary, unreasonable and confiscatory. *(Blauvelt v. Beck,* supra.) The situation presented in *City of Beloit v. Lamborn,* 182

Kan. 288, 321 P. 2d 177, is to be distinguished. Any regulation which operates as a confiscation of private property or constitutes an arbitrary or unreasonable infringement of personal property rights is void because repugnant to the constitutional guarantees of due process and equal protection of the laws. *(Capital Gas & Electric Co. v. Boynton,* 137 Kan. 717, 729, 22 P. 2d 958.)

Section 10 of the act is discriminatory in that its exemptions apply only to auction sales by *individuals* of new merchandise, which was assessed personal property tax or is replacement stock of merchandise inventory which was assessed personal property tax in the county in which the sale is to be had, and it does not exempt *partnerships* or *corporations* in a similar situation. No legal or practical reason has been advanced for such obvious discrimination.

In conclusion we hold the "New Goods Public Auction Law" is unconstitutional and invalid. It places arbitrary and unreasonable limitations, regulations and impositions on the conduct of a lawful business, and is designed to be so oppressive and unreasonable that it prohibits the conduct of such lawful business. It is also discriminatory and confiscatory. By reason thereof the appellee and other persons similarly situated are denied the guarantees of due process and equal protection of the laws, and the act abridges the privileges and immunities of the appellee and other persons similarly situated contrary to constitutional prohibitions. The act violates the Constitution of the United States and of the State of Kansas.

The judgment of the lower court is affirmed.